# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS HORTON,<br><br>Defendant. | No. CR08-0058<br><br>REPORT AND RECOMMENDATION |

## I. INTRODUCTION

On the 16th day of January 2009, this matter came on for hearing on the Motion to Suppress (docket number 11) filed by the Defendant on January 8, 2009. The Government was represented by Assistant United States Attorney Robert L. Teig. Defendant Thomas Horton appeared personally and was represented by his attorney, Jill M. Johnston.

## II. PROCEDURAL BACKGROUND

On September 25, 2008, Defendant Thomas Horton was charged by Indictment (docket number 1) with possession of a firearm as a felon. Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on February 9, 2009. On January 8, 2009, Defendant timely filed the instant Motion to Suppress.

On January 16, 2009, however, Defendant filed a Notice of Intent to Plead Guilty (docket number 19) and Notice of Conditional Guilty Plea and Reservation of Right to Appeal (docket number 20). Defendant indicated his intention to plead guilty, while reserving his right to appeal any adverse ruling on the instant Motion to Suppress. Defendant entered a conditional guilty plea at a plea change hearing on January 27, 2009.

## III. ISSUE PRESENTED

Defendant claims that the investigatory stop and detention of his person on February 5, 2008, violated the Fourth Amendment; and the fruits of a subsequent search incident to arrest, including discovery of a firearm, should be suppressed.

## IV. RELEVANT FACTS

At approximately 8:23 a.m., on February 5, 2008, Cedar Rapids police officers were dispatched to the Cedar Rapids Ground Transportation Center ("GTC") on a report of a "suspicious person." A cab driver had called 911 and reported dropping off an individual at the GTC who seemed agitated, nervous, and possibly armed with a knife.[1] The cab driver informed the 911 dispatcher that the individual he drove to the GTC was suspicious because when he arrived at the apartment complex to pick him up, the individual had difficulty exiting the front door. The cab driver told the dispatcher that the individual went upstairs to a second floor window and told him that he was going to jump out of the window in order to catch the cab. The cab driver persuaded the individual not to jump, and the individual returned to the front door, and was able to pry the door open with a knife. The cab driver also told the dispatcher that on the ride to the GTC, the individual asked him whether he was a police officer or police detective, and then they had a conversation about gang affiliations. The cab driver described the individual as a black male, wearing a black coat and grey shirt, and carrying a backpack.

Officers Bryan Furman, Scott Syverson, and Daniel Lahr responded to the GTC. Officer Furman approached the GTC in his squad car from 1st Street SE and turned onto 5th Avenue SE which runs parallel to the Trailways side of the GTC. From 5th Avenue SE, Officer Furman observed two African-American male subjects standing between the Trailways door and the loading area for Trailways buses. One of the subjects was wearing dark colored clothes matching the description provided by the cab driver. Officer Furman made a U-turn off of 5th Avenue SE into the Trailways parking area. As Officer Furman

---

[1] *See* Government's Exhibit 1 (911 Call).

was making the U-turn, the subject matching the description provided by the dispatcher, later identified as Defendant, started walking away from where he was standing, toward 1st Street SE. Defendant turned onto Transit Way SE, and Officer Syverson, who was walking up Transit Way SE, observed Defendant walk into an entryway for apartments located above the GTC. According to Officer Syverson, Defendant "quickly went inside the entryway" after seeing the officer approach.

As Officer Syverson approached the entryway, Defendant exited it, and Officer Syverson made contact with him. According to Officer Syverson, the security door inside the entryway to the apartment building was locked. Officer Syverson explained the officers' reason for being at the GTC and conducted a pat-down search of Defendant for officer safety. Officer Syverson did not find a knife or any other weapon as a result of the pat-down search. Next, Officer Syverson asked Defendant for his name and identification. Defendant did not have identification, but said his name was Tony Smith and his birth date was July 5, 1984. Officer Syverson asked Defendant if he had anything with his name on it. Defendant produced a bus ticket with the name Tony Williams. Defendant indicated that he uses a fake name when he travels. Officer Syverson requested that Defendant sit in the back seat of his squad car while the officer verified his identification. Defendant complied with the request at approximately 8:35 a.m.

In the squad car, Defendant provided Officer Syverson with two additional birth dates, July 4, 1986 and July 5, 1982. Officer Syverson next asked Defendant why he was in Cedar Rapids. Defendant replied that he was visiting a sick aunt. Defendant then offered two different last names for his aunt, Thelma Jackson and Thelma Hudson. Defendant's phone rang while he was in the squad car and Defendant gave Officer Syverson permission to answer. A conversation with a woman claiming to be Defendant's girlfriend resulted in a fourth birth date for Defendant, June 12, 1982.

Officers Furman and Lahr came to Officer Syverson's squad car. Officer Furman announced that he had located an abandoned black backpack in the GTC. Defendant stated that he was the owner of the backpack and denied permission to search it. The backpack

was placed on top of the squad car. The cab driver returned to the GTC, identified Defendant as the individual he had dropped off earlier that morning, and provided Officer Furman with additional details regarding Defendant's suspicious behavior. While Defendant was in the squad car, Officer Syverson also noticed the odor of burnt marijuana. Defendant admitted smoking marijuana that morning with his Aunt. Defendant provided the officers with an address for his Aunt. Officers spoke with the people at that address, and the people reported that they did not know anyone named Tony Smith or Tony Williams. They also reported that no one had been at their apartment that morning. After several attempts to verify Defendant's identity, and having received conflicting information regarding his identity, the officers arrested Defendant for interference with official acts at approximately 9:35 a.m. The officers searched Defendant's backpack incident to arrest and discovered a loaded handgun. At the booking, ammunition matching the handgun was found in Defendant's coat pocket.

## V. DISCUSSION

Defendant argues that the investigatory stop was not supported by a reasonable, articulable suspicion that criminal activity was afoot, and therefore, was violative of the Fourth Amendment. Defendant further argues that even if the stop was valid, the police officers exceeded the permissible scope of an investigation by continuing to detain him.

### A. Did the Stop and Pat-Down Search Violate the Fourth Amendment?

#### 1. The Stop.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417 (1981)). A police officer may stop and briefly detain a person for investigative purposes if the officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30); *see also Cortez*, 449 U.S. at 417 ("An

investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."); *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) ("Where a police officer has reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion."). A police officer is also justified in conducting an investigatory stop, if the officer has "reasonable suspicion that a crime has previously been committed by an individual." *Hughes*, 517 F.3d at 1016 (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)).

In *United States v. Ameling*, 328 F.3d 443 (8th Cir. 2003), the Eighth Circuit Court of Appeals explained that:

> A reviewing court must 'look at the "totality of the circumstances" of each case to see whether the . . . officer has a "particularized and objective basis" for suspecting legal wrongdoing.' In forming a basis for suspicion, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."' While 'an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'

*Id.* at 447 (quotations and citations omitted); *see also United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (In determining whether a police officer has a "particularized and objective basis" for suspecting criminal activity, the "'standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit.' *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002).").

In this case the police officers were told: (1) that a cab driver reported dropping off a suspicious person at the GTC; (2) that the person had initially been unable to exit the

5

front door of an apartment and had threatened to jump out a second floor window; (3) that the person eventually used a knife to exit the apartment; (4) that the person was agitated and nervous and was talking about gang affiliations; (5) that a person matching the description given by the dispatcher was seen at the GTC, *see United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008) ("Under most circumstances, when an officer observes someone who fits the description given by a dispatcher of a person involved in a disturbance, the officer may stop the suspect."), *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (same); (6) that the subject walked away from Officer Furman's squad car upon seeing Officer Furman make a U-turn into the parking area of the Trailways portion of the GTC; and (7) that the person proceeded to the entryway of a locked apartment building and abruptly went inside when seeing Officer Syverson, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (unprovoked flight upon noticing police constitutes grounds for raising the suspicions of a police officer). Based on the totality of the circumstances, the Court finds that the police officers had "reasonable suspicion" supported by "particularized and objective" facts to conduct an investigatory stop. Accordingly, the Court determines that the initial investigatory stop of Defendant did not violate the Fourth Amendment.

2.  *The Pat-Down Search.*

"During a *Terry* stop, an officer who has reason to believe the detained individual may be armed and dangerous may conduct a pat-down search for weapons to ensure officer safety." *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) (citing *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005)). In making a determination on the reasonableness of a pat-down search, courts view the facts under an objective standard, and consider the totality of the circumstances known to the officer at that time. *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007). Furthermore, it not necessary to find that the police officer is "absolutely certain that the individual is armed, rather the issue in determining the legitimacy of the search is 'whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others

6

was in danger.'" *United States v. Abokhai*, 829 F.2d 666, 670 (8th Cir. 1987) (quoting *Terry*, 392 U.S. at 27).

The same circumstances that supported the investigatory stop also supported the pat-down search of Defendant for weapons. In particular, the officer that conducted the pat-down search had information from the dispatcher that Defendant might be armed with a knife. *See Davis*, 457 F.3d at 822 ("During a *Terry* stop, an officer who has reason to believe the detained individual may be armed and dangerous may conduct a pat-down search for weapons to ensure officer safety."). Based on the totality of the circumstances, the Court determines that a prudent person in such a situation would be warranted in the belief that Defendant might be armed and his or her safety may be in danger. *See Abokhai*, 829 F.2d at 670. Therefore, the Court finds that Officer Syverson was justified in performing a pat-down search of Defendant for officer safety. Accordingly, the Court determines that the pat-down search for weapons of Defendant did not violate the Fourth Amendment.

### B. Did the Officers have Reasonable, Articulable Suspicion to Expand the Scope of the Investigation?

During a *Terry* stop, a police officer may briefly question a suspicious individual for the purpose of determining that individual's identity. *Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (An officer "may ask the detainee a moderate number of questions to determine his [or her] identity and to try to obtain information confirming or dispelling the officer's suspicions."). If during such routine questioning and investigation, the officer's suspicions are further raised, he or she "may expand the scope of the investigation." *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008); *see also United States v. Foley*, 206 F.3d 802, 806 (8th Cir. 2000) ("An officer may properly expand the scope of his [or her] investigation as reasonable suspicion dictates."). In evaluating reasonable suspicion, courts consider the totality of the circumstances, in light of the officer's experience. *Foley*, 206 F.3d at 806.

Here, following the pat-down search for weapons, Officer Syverson asked Defendant for his name and identification. Defendant did not have identification and said his name was Tony Smith and his birth date was July 5, 1984. Officer Syverson asked Defendant if he had anything with his name on it. Defendant produced a bus ticket with the name Tony Williams. Officer Syverson next asked Defendant why he was in Cedar Rapids. Defendant replied that he was visiting a sick aunt. Defendant offered two different last names for his aunt, Thelma Jackson and Thelma Hudson. In response to additional questioning, Defendant provided Officer Syverson with two additional birth dates, July 4, 1986 and July 5, 1982. While he was in the squad car, Defendant's phone rang and Officer Syverson had a conversation with a woman claiming to be Defendant's girlfriend. The woman provided a fourth birth date for Defendant, June 12, 1982. At the hearing, Officer Syverson testified that Defendant's conflicting names, birth dates, and names for his aunt raised his suspicions that Defendant might be lying in an attempt to avoid an arrest warrant. Officer Syverson testified that in his experience, defendants often provided false names, false social security numbers, and false birth dates in order to avoid detection of outstanding warrants.

Based on the totality of the circumstances and in light of Officer Syverson's experience, the Court finds that Defendant's answers to Officer Syverson's routine questions reasonably raised Officer Syverson's suspicion to expand the scope of his investigation for the purpose of verifying Defendant's identification. *See Foley*, 206 F.3d at 806. Accordingly, the Court determines that the expansion of the scope of the investigation did not violate the Fourth Amendment.

## VI. CONCLUSION

The Court concludes that the police officers did not violate Defendant's Fourth Amendment rights during the investigatory stop and pat-down search conducted on February 5, 2008.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **DENY** the Motion to Suppress (docket number 11) filed by the Defendant on January 8, 2009.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *Defendant is reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if Defendant is going to object to this Report and Recommendation, he must promptly order a transcript of the hearing held on January 16, 2009.*

DATED this 26th day of January, 2009.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA